# AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, ▮▮▮▮▮▮▮▮▮ a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn according to the law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. Your Affiant, ▮▮▮▮▮▮▮▮▮ is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, with the meaning of Title 18, United States code, Section 3051, and is an officer of the United States empowered by law with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

2. Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking laws and conspiracy laws. Prior to graduating from the Federal Law Enforcement Training Center in 2020 and becoming an ATF Special Agent, Your Affiant was employed with Ernst and Young for over four (4) years, working as a Senior Forensic Accountant in Ernst and Young's Forensic Accounting practice. While employed as an ATF Special Agent, Your Affiant has conducted and participated in numerous federal investigations. Your Affiant has participated in the execution of numerous federal and state search warrants involving violent crime, organized crime, illegal firearms possession, firearms trafficking, the use and trafficking of narcotics, and armed narcotics trafficking. Your Affiant is familiar with federal criminal laws pertaining to firearms and drug violations.

3. Your Affiant works with other law enforcement officers with decades of experience enforcing federal firearms laws, and Your Affiant benefits from their knowledge. Your Affiant investigates violations of federal firearms laws and federal narcotics laws in the normal course of his duties and is familiar with the facts of this case.

4. The statements contained in this affidavit are based, in part, on information provided by Special Agents and Task Force Officers of the ATF and other law enforcement officers; on conversations held with police officers; and on Your Affiant's background and experience as a Special Agent of the ATF. Your Affiant has not included each and every fact known to Your Affiant concerning this investigation. Your Affiant has set forth only the facts that Your Affiant believes are necessary to establish the required foundation for an order authorizing the arrest of Luis Aguilera-Pericaguan.

## AFFIDAVIT PURPOSE

5. This affidavit is submitted to support a criminal complaint and application for arrest warrant for and against Luis Aguilera-Pericaguan.

6. Your Affiant submits that from on or about November 14, 2024, through March 27, 2025, in the State and District of Colorado, the defendant, Luis Aguilera-Pericaguan, along with both identified and unidentified co-conspirators, attempted and conspired to illegally traffic in firearms, in violation of 18 U.S.C. § 933(a)(1) and (a)(3), and conspiracy to distribute controlled substances, ketamine and MDMA, in violation of 21 U.S.C. § 846.

1

7. Because this affidavit is submitted only to obtain a criminal complaint and arrest warrant, I have set forth only those facts I believe are necessary to establish probable cause for the above-mentioned offenses.

8. The facts in this affidavit come from my personal observations, interviews, police reports, body camera footage, jail calls, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## INVESTIGATION

9. The United States, including the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), is conducting a criminal investigation of Luis Aguilera-Pericaguan, and both identified and unidentified co-conspirators regarding violations of 18 U.S.C. § 933(a)(1) and (a)(3), Illegal Trafficking in Firearms, Attempt and Conspiracy, and 21 U.S.C. § 846, conspiracy to distribute controlled substances (hereinafter "the Subject Offenses").

10. In October of 2024, the ATF began an investigation into armed narcotics and firearms trafficking activities occurring in the Denver, CO area, stemming from information obtained from the Arapahoe County Sheriff's Office. A Confidential Informant ("CI") was directed by Your Affiant to frequent an apartment complex with an increase in criminal activity, located in Denver, CO, to obtain information relating to individual(s) engaged in criminal activity. The CI has been given monetary compensation in exchange for giving law enforcement reliable information on criminal activities on dozens of prior occasions, and no information provided by the CI has subsequently proven false. He/she is not trying to reduce any sentence in exchange for his/her cooperation. The CI has past felony convictions, but none within the last 9 years, and none involving falsehoods or deception.

11. According to the CI, he/she met an individual identified as Luis Aguilera-Pericaguan on or about October 9, 2024, in the area around the Ivy Crossing Apartment Homes complex. During the initial interaction, Aguilera-Pericaguan. discussed with the CI that Aguilera-Pericaguan. was from Venezuela and has numerous associates in the Denver and Aurora areas who are also from Venezuela. Over the course of the next several weeks, the CI and Aguilera-Pericaguan. engaged in recorded communications in which Aguilera-Pericaguan. purported to be involved in firearms trafficking activities with his criminal associates.

12. The undercover meetings discussed below are only those with relevance as they pertain to the criminal activities of Luis Aguilera-Pericaguan for the specific purpose of this criminal complaint.

### *Undercover Purchase – November 14, 2024*

13. Between October 9, 2024, and November 14, 2024, at the direction of Your Affiant, the CI engaged in conversation with Aguilera-Pericaguan regarding purchasing multiple firearms from Aguilera-Pericaguan and his criminal associates.

2

Case No. 1:25-mj-00063-STV *SEALED* Document 6 filed 08/13/25 USDC Colorado pg 4 of 20

14. On November 14, 2024, prior to the undercover meeting, the CI informed ATF SA 6373 ("UC1") that Aguilera-Pericaguan had a friend (who was subsequently identified as Jose Manuel Guerra-Caballero) who had multiple firearms for sale. While in the presence of Aguilera-Pericaguan and Guerra-Caballero, the CI placed a FaceTime call to UC1 to show UC1 the firearms that Aguilera-Pericaguan and Guerra-Caballero were attempting to sell. During the FaceTime call, UC1 observed Guerra-Caballero to be wearing the same pink shirt that Guerra-Caballero would later wear to an ATF undercover controlled location (UC Location), which is located in the City and County of Denver, CO. Additionally, during the FaceTime call, UC1 observed Guerra-Caballero remove two (2) firearms from a backpack and show UC1. Both firearms shown to UC1 by Guerra-Caballero on the FaceTime call appeared to be the same firearms and that UC1 would purchase from Guerra-Caballero later that day as described below.

15. Later on November 14, 2024, the CI, at the request of Aguilera-Pericaguan and Guerra-Caballero, picked up Aguilera-Pericaguan and Guerra-Caballero at the Ivy Crossing apartment complex, located at 2470 S Quebec St, Denver, CO 80231. The CI advised UC1 that the CI and Aguilera-Pericaguan then drove to another area in the Ivy Crossing apartment complex area where Guerra-Caballero was observed exiting the south stairwell area of the building with assigned address ▬▬ E Harvard Ave, Denver, CO 80231, carrying a backpack, and entered the CI's vehicle. The CI then drove Aguilera-Pericaguan and Guerra-Caballero to the UC Location, where the below undercover meeting took place between UC1, ATF SA 3997 ("UC2"), the CI, Aguilera-Pericaguan, and Guerra-Caballero.

16. The CI arrived at the UC Location with Aguilera-Pericaguan and Guerra-Caballero. UC1 exchanged greetings with Aguilera-Pericaguan and Guerra-Caballero, and Guerra-Caballero introduced himself to UC1 as "Jose." Guerra-Caballero and Aguilera-Pericaguan walked to the back area of the garage. Guerra-Caballero placed the backpack he was carrying onto the top of the bar and pulled out two firearms and a 30-round magazine. The Keltec firearm was folded in half when Guerra-Caballero pulled it out of the backpack. Guerra-Caballero then unfolded the Keltec firearm for UC1 to see and picked up the 30-round magazine which UC1 observed to have ammunition inside the magazine. Guerra-Caballero placed the magazine inside the Keltec firearm to show UC1 how it worked. Guerra-Caballero then gave the Keltec firearm with the loaded magazine to UC1. Guerra-Caballero demonstrated to UC1 how the Keltec firearm worked. He showed UC1 how to pull the bolt back to the rear of the firearm and load the firearm with live ammunition. Guerra-Caballero explained after the Keltec firearm is loaded with the 30-round magazine, one pull of a trigger will fire all 30 rounds at the same time. As UC1 was testing the bolt of the firearm, Guerra-Caballero said the Keltec firearm was "*automatica*." Guerra-Caballero pointed to the number "30" on the back of the magazine, and then advised that when the trigger is pulled it just dumps all the rounds at once. UC1 explained to Guerra-Caballero and AGUILERA-PERICAGUAN that purchasing the Keltec firearm for $1,200 was a little expensive if the firearm was not a fully automatic machinegun. Aguilera-Pericaguan demonstrated with Aguilera-Pericaguan's hands and told UC1 the Keltec firearm sounds like "Brrrrrrrrrrrt," which UC1 understood as street terminology for the firearm being a fully automatic machinegun.

17. Guerra-Caballero picked up the second firearm, a Ruger revolver, and showed UC1 the firearm did not have any live ammunition inside of the cylinder. Guerra-Caballero then pointed the revolver and pulled the trigger multiple times. As Guerra-Caballero was pulling the trigger to show UC1 how the Ruger revolver worked, Guerra-Caballero advised the Ruger revolver does not

3

dispose of spent shell casings. UC1 understood this as a reference to having to pick up shell casing if the firearm is used in a shooting so law enforcement wouldn't find the spent shell casings. Guerra-Caballero advised UC1 that as long as UC1 conducts good business and purchases the firearms at a fair price, Guerra-Caballero will have additional firearms for UC1 to purchase and everyone involved in the firearm transaction can all make good money trafficking firearms. UC1 told Guerra-Caballero and Aguilera-Pericaguan where UC1 takes the firearms to sell that UC1 makes more money if the firearms are fully automatic machineguns. Guerra-Caballero then pulled out a cell phone with a white case and opened up a messaging application. Guerra-Caballero clicked on a contact and showed UC1 a picture of multiple pistols. Guerra-Caballero advised the pistols are fully automatic pistols. UC1 asked about the prices of the firearms. Guerra-Caballero confirmed that the prices of the firearms were $1,200 to purchase the Keltec firearm and $800 to purchase the Ruger revolver. Guerra-Caballero then pulled out six (6) rounds of ammunition from the backpack and placed them on the bar. Guerra-Caballero advised the ammunition was for the revolver, and it was hollow point ammunition. Guerra-Caballero explained the hollow point ammunition was designed to explode when it hits a person to do the maximum amount of physical damage.

18. UC1 counted out $1,200 of pre-recorded buy money/U.S. currency and gave it to Guerra-Caballero for the purchase of the Keltec, model Sub-2000, 9mm caliber rifle, bearing S/N: FF3091. UC1 then counted out $800 of pre-recorded buy money/U.S. currency and gave it to Guerra-Caballero for the purchase of the Ruger, model Speed Six, .357 caliber revolver, bearing S/N: 15661160. Guerra-Caballero and Aguilera-Pericaguan asked if UC1 has more money to purchase additional firearms. UC1 also counted out $150 of pre-recorded buy money/U.S. currency and gave it to Aguilera-Pericaguan for a brokerage fee for setting up the firearms transaction. Guerra-Caballero advised Guerra-Caballero didn't want to acquire more firearms if UC1 wouldn't promise to buy them from Guerra-Caballero. UC1 asked if Guerra-Caballero was talking about the pistols in the picture that Guerra-Caballero showed to UC1. Guerra-Caballero advised Guerra-Caballero was talking about the fully automatic machineguns from the picture that Guerra-Caballero showed UC1. The CI and UC1 then told Guerra-Caballero and Aguilera-Pericaguan that UC1 takes the firearms to New Mexico, and the firearms then get trafficked further south into Mexico. UC1 explained again that UC1 makes more money trafficking the firearms to Mexico if they are fully automatic machineguns.

19. The CI advised Guerra-Caballero and Aguilera-Pericaguan that sometimes the UCs, who own the UC Location, are looking for help doing odd jobs. Guerra-Caballero advised the CI if the UCs need help with committing extortions or assaults that Guerra-Caballero can assist the UCs if the UCs pay a good price. UC2 said that sometimes the UCs have to go collect a debt from people who owe money, and the UCs might be interested in hiring Guerra-Caballero. Guerra-Caballero advised to contact Guerra-Caballero and let Guerra-Caballero know and Guerra-Caballero is willing to commit acts of violence on behalf of the UCs. UC2 asked if Guerra-Caballero has a car and is able to drive, and Guerra-Caballero advised Guerra-Caballero is able to drive. UC2 asked if Guerra-Caballero has any narcotics available for sale. Guerra-Caballero advised Guerra-Caballero has some narcotics for sale and asked what quantities the UCs are wanting to purchase. Guerra-Caballero advised that Guerra-Caballero could sell two (2) ounces of cocaine for $1,400. Guerra-Caballero advised Guerra-Caballero would have to drive somewhere to pick it up. Guerra-Caballero and Aguilera-Pericaguan then advised they need the money for the source of supply to give them the cocaine, so they would not be able to bring the cocaine to the UC Location without the UCs first paying for the cocaine.

4

20. Guerra-Caballero advised if UC1 wants to purchase the fully automatic machineguns that Guerra-Caballero showed in a picture to UC1, that UC1 would have to drive to Guerra-Caballero's friend to purchase the firearms. Aguilera-Pericaguan advised they came to the UC Location today because they know the CI, but the other people with the firearms don't know the UCs or CI so the UCs will have to drive to meet the new people who have firearms for sale. Guerra-Caballero advised there are a lot of Venezuelans in the Denver area, and Venezuelans don't typically trust other people. Aguilera-Pericaguan advised most Venezuelans wouldn't trust the UCs because the UCs are talking about firearms and money. Guerra-Caballero advised his friend with additional firearms for sale is in the Westminster, CO area, and the UCs would have to meet Guerra-Caballero at Guerra-Caballero's friend's residence to purchase the firearms.

21. As Guerra-Caballero and Aguilera-Pericaguan were preparing to leave the UC Location, Guerra-Caballero advised Guerra-Caballero has access to purchasing girls from Mexico and bringing them to Denver. Guerra-Caballero advised the UCs would just have to pay Guerra-Caballero $3,000, and once Guerra-Caballero gave the purchased girl to the UCs, the girl would owe a debt of $20,000 to the UCs. UC2 asked if Guerra-Caballero has access to girls locally in the case the UCs wanted to pay for girls to be at a party. Guerra-Caballero affirmed, and advised Guerra-Caballero could provide girls to the UCs to have at a party for a fee. Guerra-Caballero advised Guerra-Caballero would bring the girls to a location and tell the girls they are working at a party for the night. Guerra-Caballero advised some of the girls that Guerra-Caballero would provide for parties are currently located in the Dallas, TX area, but if the UCs wanted to purchase girls, they most likely would be coming from Mexico. Guerra-Caballero advised he needs to confirm the details on his end prior to the UCs placing an order to purchase girls.

22. UC2 asked to confirm what the girls look like that are available for purchase. Guerra-Caballero then pulled out the aforementioned cell phone with a white case, as well as another cell phone with a dark blue/black case. UC1 observed the cell phone with a white case was an Android device, and the cell phone with a dark blue/black case was an iPhone device. Guerra-Caballero opened the "Gallery" application on the Android device and showed the UCs multiple videos and pictures of girls who appeared to be young in age. One of the pictures was a girl wearing a short skirt and holding an AR style firearm. Guerra-Caballero confirmed with the UCs that they could pick out what specific girl they wanted to purchase.

23. The CI, Guerra-Caballero, and Aguilera-Pericaguan then got back into the CI's vehicle and left the area of the UC Location. Immediately following the conclusion of the undercover meeting, the CI drove Aguilera-Pericaguan and Guerra-Caballero back to the Ivy Crossing apartment complex. After Aguilera-Pericaguan and Guerra-Caballero exited the CI's vehicle, the CI drove away from the Ivy Crossing apartment complex and the undercover meeting concluded.

24. The UCs purchased several items, to include a Keltec, model Sub-2000, 9mm caliber rifle, bearing S/N: FF3091, and a Ruger, model Speed Six, .357 caliber revolver, bearing S/N: 15661160, including each firearm being sold with ammunition.

Case No. 1:25-mj-00163-SKC *SEALED* Document 6-1 filed 08/15/25 USDC Colorado pg 5 of 19




*Undercover Purchase – November 15, 2024*

25. Between November 14, 2024, and November 15, 2024, at the direction of Your Affiant, the CI continued to engage in recorded text messages and recorded phone calls with Aguilera-Pericaguan regarding an additional purchase several firearms. On November 15, 2024, the CI, at the request of Aguilera-Pericaguan and Guerra-Caballero, picked up Aguilera-Pericaguan and Guerra-Caballero at the Ivy Crossing apartment complex, located at 2470 S Quebec St, Denver, CO 80231, and drove to the UC Location.

26. On November 15, 2024, when the CI arrived at the UC Location, the CI parked in the rear alley area outside of the undercover location and Aguilera-Pericaguan and Guerra-Caballero entered the undercover location with Guerra-Caballero wearing a backpack. Guerra-Caballero sat down on a couch in the rear garage area of the undercover location and took off the backpack and set it on the floor and proceeded to take out two pistols from the backpack. Guerra-Caballero then unloaded both pistols and showed them to the UCs to inspect. Guerra-Caballero explained that both pistols were "semi-automatic pistols", and further explained that did not mean that the pistols were fully automatic, as in being machine guns, only that they were referred to as "*automaticas*" in Venezuela. The UCs asked Guerra-Caballero how much money Guerra-Caballero wanted for both pistols, a Glock and a Sig Sauer, and Guerra-Caballero responded that he wanted $2,700 for both pistols. UC2 asked Guerra-Caballero if he would be willing to sell the pistols for $2,500 instead, and Guerra-Caballero replied that he would be willing to sell both pistols for $2,600. UC2 then briefly walked to another room of the undercover location to obtain the pre-recorded Agent Cashier Funds (ACF), (buy money/U.S. currency) for the undercover purchase of the two firearms. UC2 returned with the money shortly thereafter and proceeded to count the money at a bar/counter area of the undercover location.

27. As UC2 was counting the money, UC1 and the CI had additional conversations with Guerra-Caballero and Aguilera-Pericaguan about the possibility of obtaining Glock machine gun conversion devices, commonly referred to as Glock switches for the Glock pistol. Guerra-Caballero replied that he was familiar with the machine gun conversion devices and further stated that he would be able to obtain the devices through his contacts with other Venezuelan nationals. UC2 then directed UC1, the CI, Guerra-Caballero, and Aguilera-Pericaguan over to the bar/counter area where UC2 had the money ready for the purchase of the two pistols. The CI handed the Sig Sauer pistol to UC2, and UC1 carried the Glock pistol over to the bar/counter area so that UC2 could further inspect both pistols. UC2 observed that the two pistols were a Glock Model 22 .40 caliber pistol with an

6

obliterated serial number and a tactical flashlight attached to the frame of the firearm, which was loaded with six (6) rounds of .40 caliber ammunition, and a Sig Sauer Model P320 M17 9mm caliber pistol bearing serial number 59H351986, which was loaded with seven (7) rounds of 9mm caliber ammunition.

28. UC2 then counted out $2,600 of pre-recorded Agent Cashier Funds (buy money/U.S. currency) for the undercover purchase of the two pistols and showed the money to Guerra-Caballero so he could confirm that the amount of money for the purchase was correct, and then subsequently placed the buy money on the bar countertop for Guerra-Caballero for the purchase of the Glock pistol and the Sig Sauer pistol. UC2 then also paid an additional 150.00 of buy money to Aguilera-Pericaguan for his role in arranging and brokering the purchase of the pistols from Guerra-Caballero as part of the undercover transaction. Guerra-Caballero then continued talking to the UCs about sex trafficking of Venezuelan females and selling the females to the UCs for the purpose of sex work, which was a continuation of the conversation between Aguilera-Pericaguan, Guerra-Caballero, and the UCs from the prior undercover contact. Guerra-Caballero explained that he could provide females to the UCs for parties, and further stated that the UCs could do whatever they wanted with females after they purchased them. Guerra-Caballero further stated that the UCs would be responsible for providing food and housing to the females and the females would be responsible for working off an additional monetary payment to Guerra-Caballero as part of the agreement. Guerra-Caballero further explained that the Venezuelans currently had females working for them in the sex trade in China, Peru, and in every state in the United States who were making money for them.

29. The UCs asked Guerra-Caballero how old the females that he had available were, and Guerra-Caballero replied that none of the females were older than twenty-four years old. UC2 told Guerra-Caballero that he would want to take the females to Wyoming to work for him and provide sexual services to the oil field workers. Guerra-Caballero replied that he would be able to provide women to UC2 for that purpose. Guerra-Caballero then took out his cell phone and made a live FaceTime video call to an unknown Hispanic female and during the video call Guerra-Caballero showed the live video to the UCs and CI and told them that he could bring the specific female on the video call to Wyoming to work for the UCs.

30. The CI, Aguilera-Pericaguan, and Guerra-Caballero left the undercover location, and the CI subsequently transported both Aguilera-Pericaguan and Guerra-Caballero back to the Ivy Crossing apartment complex, located at 2470 S Quebec St, Denver, CO 80231. After Aguilera-Pericaguan and Guerra-Caballero exited the CI's vehicle, the CI drove away from the Ivy Crossing apartment complex and the undercover meeting concluded.

31. The UCs purchased several items, to include a Glock Model 22 .40 caliber pistol with an obliterated serial number and a tactical flashlight attached to the frame of the firearm, which was loaded with six (6) rounds of .40 caliber ammunition, and a Sig Sauer Model P320 M17 9mm caliber pistol bearing serial number 59H351986, which was loaded with seven (7) rounds of 9mm caliber ammunition.

7

 

*Undercover Purchase – December 3, 2024*

32. Between November 15, 2024, and December 3, 2024, at the direction of Your Affiant, the CI continued to engage in recorded text messages and recorded phone calls with both L.A.P. and Guerra-Caballero regarding an additional purchase of firearms and narcotics.

33. On December 3, 2024, Aguilera-Pericaguan and Guerra-Caballero arrived at the UC Location driving a green Ford Escort SE, bearing Colorado license plate ▬▬▬▬. Aguilera-Pericaguan exited the vehicle from the front passenger seat, and Guerra-Caballero exited the vehicle from the driver's seat. Guerra-Caballero was carrying a black and silver colored AR style firearm. Guerra-Caballero placed the firearm on the bar and extended tri-pod legs that were attached to the barrel of the AR style firearm to show UC1 how it worked. GUERRA then showed the CI and UC1 a magazine loaded with ammunition and placed the magazine into the magazine well of AR style firearm. Aguilera-Pericaguan advised Aguilera-Pericaguan's associates had additional firearms for sale but did not want to meet at the UC Location because Aguilera-Pericaguan's associates did not know UC1. Aguilera-Pericaguan advised that Aguilera-Pericaguan was calling his associates to see if they would bring the firearms to the UC Location. Aguilera-Pericaguan then showed the CI and UC1 a video on Aguilera-Pericaguan's cell phone. In the video, UC1 observed an unknown Hispanic individual was displaying an AR style firearm that was different than the firearm brought to the UC Location by Guerra-Caballero and Aguilera-Pericaguan.

34. Aguilera-Pericaguan advised Aguilera-Pericaguan was actively attempting to set up an additional firearm transaction for Aguilera-Pericaguan's associates to bring another AR style firearm to the UC Location. UC1 asked if Aguilera-Pericaguan and Guerra-Caballero brought a Glock pistol to sell, as Guerra-Caballero and Aguilera-Pericaguan had previously discussed with the CI in recorded communications selling a Glock pistol. Guerra-Caballero reached inside his waist band and removed a Glock, model 19, 9mm caliber pistol. Guerra-Caballero placed the Glock 19 onto the bar and Guerra-Caballero advised UC1 could look at the Glock 19 to determine if UC1 wanted to purchase the firearm. UC1 discussed with Aguilera-Pericaguan about purchasing additional firearms at a lower price. Aguilera-Pericaguan picked up the Glock, model 19, 9mm caliber pistol, examined it, and placed it back on the bar for UC1 to consider purchasing. UC1 asked about the prices of the firearms. UC1 advised the CI to inform Guerra-Caballero and Aguilera-Pericaguan that UC1 would pay $700 for the Glock 19 pistol. Guerra-Caballero advised that a store might sell a Glock 19 pistol for around $700, but street prices are higher than store prices because sellers of firearms need to make seller fees. Guerra-Caballero advised he will sell the AR style firearm for $1,500, and he will sell the Glock 19 pistol for $1,000. UC1 advised the CI to explain to

8

Guerra-Caballero and Aguilera-Pericaguan that UC1 takes all the firearms he purchases from Guerra-Caballero and Aguilera-Pericaguan to Mexico and sells the firearms in Mexico. However, UC1 has to purchase the firearms at a low price in the Denver area so UC1 can make money selling the firearms to people in Mexico.

35. Aguilera-Pericaguan and Guerra-Caballero discussed selling UC1 a type of narcotic with the street name "tusi," which is a narcotic commonly known to contain a variety of controlled substances including methamphetamine, cocaine, MDMA, and ketamine. Aguilera-Pericaguan and Guerra-Caballero advised they forgot to bring a sample of the "tusi," but they could bring it later in the day for UC1 to test out.

36. UC1 counted out $1,500 of pre-recorded buy money/U.S. currency and gave it to Guerra-Caballero for the purchase of the no make, no model, no serial number, .223 caliber, semi-automatic firearm, as well as a magazine containing 30-rounds of .223 caliber ammunition. As Aguilera-Pericaguan was speaking with the CI, the CI advised that Aguilera-Pericaguan asked the CI if UC1 was going to give Aguilera-Pericaguan a brokerage fee for setting up the firearms transaction for the black and silver AR style firearm. The CI advised that Aguilera-Pericaguan inferred that $150 was a fair brokerage fee as that is what UC1 paid L.A.P. for brokering the previous firearms transactions. UC1 counted out $150 of pre-recorded buy money/U.S. currency and gave it to Aguilera-Pericaguan as a brokerage fee for facilitating the firearms transaction. Guerra-Caballero and Aguilera-Pericaguan got back into the green Ford Escort and left the area of the UC Location.

37. UC1 purchased a firearm, specifically, a no make, no model, no serial number, .223 caliber, semi-automatic personally made firearm, as well as a magazine containing 30-rounds of .223 caliber ammunition.




*Undercover Purchase – February 4, 2025*

38. Between December 3, 2024, and February 4, 2025, at the direction of the ATF, the CI continued to engage in recorded text messages and recorded phone calls with Aguilera-Pericaguan utilizing cellular phone number ▇▇▇▇▇▇ regarding an additional purchase of firearms and narcotics.

39. On February 4, 2025, Aguilera-Pericaguan met with ATF UCs to sell a firearm to the UCs. During this undercover controlled purchase, Aguilera-Pericaguan arrived at the UC Location with an unidentified Hispanic male, who was subsequently identified as Jonathan Medina. During this meeting, Medina produced a Glock, model 39, .45 caliber pistol bearing serial number HCH228,

9

and sold the Glock pistol to the UCs. The UCs paid Medina $800 in pre-recorded buy money/U.S. currency for the Glock pistol. Aguilera-Pericaguan requested payment from the UCs as a brokerage fee for bringing Medina to the UCs to sell the Glock pistol. The UCs paid Aguilera-Pericaguan $160 in pre-recorded buy money/U.S. currency as a brokerage fee for the Glock pistol. During this undercover interaction, the UCs and CI advised the suspects that the UCs were purchasing the firearms to transport the firearms to Mexico and sell the firearms for profit to individuals in Mexico.



*Undercover Purchase – February 11, 2025*

40. Between February 4, 2025, and February 11, 2025, at the direction of the ATF, the CI communicated with Aguilera-Pericaguan using phone number ▮▮▮▮▮▮▮▮▮▮ to set up a controlled purchase. During these recorded conversations, Aguilera-Pericaguan provided the phone number ▮▮▮▮▮▮▮▮▮▮ to the CI as the WhatsApp contact number for Medina. Beginning on February 10, 2025, the CI began engaging in recorded communications with Medina on WhatsApp using the WhatsApp number ▮▮▮▮▮▮▮▮▮▮, which has a Columbia country code phone number. The CI then began communicating with both Aguilera-Pericaguan and Medina to set up a controlled purchase of firearms.

41. On February 11, 2025, Aguilera-Pericaguan, Medina, and an unidentified Hispanic male, who was subsequently identified as Keidinson Orlando Torrealba-Gonzalez, met with ATF UCs to sell the firearms to the UCs. During the meeting, Torrealba-Gonzalez produced a Beretta, model 92FS, 9mm caliber semi-automatic pistol, bearing serial number K36900Z, and a Walther, model PDP full size, 9mm caliber semi-automatic pistol, bearing serial number FDI2265, along with magazines and ammunition. The UCs paid Torrealba-Gonzalez $2,050 in pre-recorded buy money/U.S. currency for the firearms and ammunition. After the purchase of the firearms was completed, Aguilera-Pericaguan was paid $300 in pre-recorded buy money/U.S. currency as a brokerage fee for the firearms and ammunition, and Medina was paid $50 in pre-recorded buy money/U.S. currency as a brokerage fee for the firearms and ammunition. During this undercover interaction, the UCs and CI advised the suspects that the UCs were purchasing the firearms to transport the firearms to Mexico and sell the firearms for profit to individuals in Mexico.



*Undercover Purchase – February 14, 2025*

42. Between February 11, 2025, and February 14, 2025, at the direction of the ATF, the CI communicated with Aguilera-Pericaguan using phone number ▇▇▇▇▇, as well as communicated with Medina using the WhatsApp number ▇▇▇▇▇, to set up a controlled purchase. On February 14, 2025, Aguilera-Pericaguan and Medina met with the UCs to sell the firearms and narcotics to the UCs.

43. During the meeting, Medina produced a Glock, model 22, .40 caliber pistol bearing serial number BBT793, a Glock, model 17, 9mm caliber pistol with an attached tactical flashlight bearing serial number 0523LAV, a Sig Sauer, model P365, 9mm pistol bearing serial number 66B370068, a Glock, model 27 .40 caliber pistol bearing serial number PKN683, along with magazines and ammunition, and approximately 31 grams (1 oz.) of Tusi (suspected ketamine/cocaine narcotic mixture). The UCs paid Medina $4,800 in in pre-recorded buy money/U.S. currency for the purchase of the firearms and ammunition, and paid Medina $1,500 in pre-recorded buy money/U.S. currency or the purchase of the Tusi. The UCs also paid Aguilera-Pericaguan $400 in pre-recorded buy money/U.S. currency as a brokerage fee for his assistance in setting up the transaction. During this undercover interaction, the UCs and CI advised the suspects that the UCs were purchasing the firearms to transport the firearms to Mexico and sell the firearms for profit to individuals in Mexico. Laboratory testing is pending on the Tusi.

11



*Undercover Purchase – February 20, 2025*

44. Between February 14, 2025, and February 20, 2025, at the direction of the ATF, the CI communicated with Aguilera-Pericaguan using phone number ▇▇▇▇▇▇ (the Subject Account), as well as communicated with Medina using the WhatsApp number ▇▇▇▇▇▇, to set up a controlled purchase. On February 20, 2025, Aguilera-Pericaguan, Medina, and a previously unidentified Hispanic female, who was subsequently identified as A. L., met with the UCs to sell the firearms and narcotics to the UCs.

45. During the meeting, Medina produced a Taurus, model G3C, 9mm caliber pistol bearing serial number ACB499361, a Girsan, model MC 1911 S10, 10mm caliber pistol bearing serial number T6368-23DV00203, a Taurus, model GX4, 9mm caliber pistol bearing serial number 1GA60879, along with magazines and ammunition, and approximately 8 oz. (244 grams) of Tusi. The UCs paid Medina $2,900 in in pre-recorded buy money/U.S. currency for the purchase of the firearms and ammunition, and paid Medina $10,000 in pre-recorded buy money/U.S. currency or the purchase of the Tusi. The UCs also paid Aguilera-Pericaguan $300 in pre-recorded buy money/U.S. currency as a brokerage fee for his assistance in setting up the transaction. During the undercover meeting, Aguilera-Pericaguan and Medina engaged in conversation with the UCs about girls that are for sale to own or hire out for parties. Aguilera-Pericaguan and Medina advised that A. L. is in charge of the girls that are available for hire. As the UCs engaged in conversation about how much it cost to hire out girls for a party, Aguilera-Pericaguan asked how many girls the UCs would want and how long they would want them for. Medina then walked back to his vehicle and briefly spoke to A. L. and then returned with her cellular telephone and subsequently began showing the UCs and CI photos of females on the cell phone that would be available to the UCs to hire for a party. During this undercover interaction, the UCs and CI advised the suspects that the UCs were purchasing the firearms to transport the firearms to Mexico and sell the firearms for profit to individuals in Mexico. Preliminary laboratory testing indicates the presence of ketamine, a schedule III controlled substance, and MDMA, a schedule I controlled substance, in the Tusi purchased during this transaction.

12



*Undercover Purchase – February 27, 2025*

46. Between February 20, 2025, and February 27, 2025, at the direction of the ATF, the CI communicated with Aguilera-Pericaguan using phone number ▮▮▮▮▮, as well as communicated with Medina using the WhatsApp number ▮▮▮▮▮, to set up a controlled purchase. On February 27, 2025, Aguilera-Pericaguan and Medina met with the UCs to sell the firearms to the UCs.

47. During the meeting, Medina produced an American Tactical, model Mil-Sport, multi-caliber pistol, bearing serial number MSA079646, a New Frontier, model LW-15, .223 caliber rifle bearing serial number NLV73549, a Glock, model 19, 9mm caliber pistol bearing serial number BYK627US, a Glock, model 26GEN5, 9mm pistol bearing serial number AFYU582, affixed with a Glock switch machinegun conversion device (allowing the Glock pistol to function as a machinegun), a Polymer80, no model, 9mm caliber pistol, bearing no serial number, a Glock, model 34GEN4, 9mm caliber pistol, bearing serial number BCUS507, and a Smith & Wesson, model M&P40, .40 caliber pistol, bearing serial number HAR9146, along with magazines and ammunition. The UCs paid Medina $9,000 in in pre-recorded buy money/U.S. currency for the purchase of the firearms and ammunition. The UCs also paid Aguilera-Pericaguan $600 in pre-recorded buy money/U.S. currency as a brokerage fee for his assistance in setting up the transaction. During the meeting, the UCs engaged in further conversation about A. L.'s role in providing girls for hire to the UCs. Medina advised he would call A. L. to engaged in further conversation about specifics. As Medina was placing the phone call to A. L., the CI observed Medina place a call to the phone number ▮▮▮▮▮. During this undercover interaction, the UCs and CI advised the suspects that the UCs were purchasing the firearms to transport the firearms to Mexico and sell the firearms for profit to individuals in Mexico.

13





*Undercover Purchase – March 6, 2025*

48. Between February 27, 2025, and March 6, 2025, at the direction of ATF, the CI engaged in conversation with Aguilera-Pericaguan regarding purchasing multiple firearms from Aguilera-Pericaguan and his criminal associates.

49. On March 6, 2025, prior to the undercover meeting, the CI informed ATF SA 6373 that Aguilera-Pericaguan had associates (who were subsequently identified as Esleiter Vargas-Morales, Randy Delgado-Perez, Lenguinyer Guevara-Muro, and Jhon Villalobos-Salas) who had multiple firearms and "Tusi" (a street narcotic commonly known to contain a variety of controlled substances) for sale. Aguilera-Pericaguan then agreed to broker a firearms and narcotics transaction between ATF undercover agents (UCs) and Aguilera-Pericaguan's associates.

50. On March 6, 2025, at approximately 1350 hours, Aguilera-Pericaguan arrived at an ATF undercover controlled location (UC Location) with Vargas-Morales, Delgado-Perez, Guevara-Muro, and Villalobos-Salas in a gold Toyota Camry, bearing no license plate.

14

51. During the initial portion of the undercover meeting, the suspects initially advised the CI that they were not able to cook the tusi prior to arriving at the UC Location. They stated that they had most of the materials and equipment but needed to gather a few more items to be able to manufacture the tusi and then sell it to the UCs. Guevara-Muro asked if he could cook the tusi at the UC Location, and the UCs stated that he could. Additionally, the suspects advised the CI and UCs that the suspects would be willing to engage in acts of violence at the request of the UCs for a payment.

52. During the initial portion of the undercover meeting, Vargas-Morales produced two firearms, specifically a Glock, model 43X, 9mm pistol, bearing serial number AHPC567 with a magazine loaded with ten (10) rounds of 9mm ammunition, and a Kahr Arms, model PM40, .40 caliber pistol bearing serial number WA2632, with a magazine loaded with five (5) rounds of .40 caliber ammunition, to sell to the UCs. The UCs paid Vargas-Morales $2,200 in in pre-recorded buy money/U.S. currency for the purchase of the firearms and ammunition. The UCs also paid Aguilera-Pericaguan $200 in pre-recorded buy money/U.S. currency as a brokerage fee for his assistance in setting up the firearms transaction. The suspects then advised that they would leave the UC Location to acquire what they needed to manufacture the tusi, as well as pick up additional firearms to sell to the UCs.

53. At that time, Aguilera-Pericaguan, Vargas-Morales, Delgado-Perez, Guevara-Muro, and Villalobos-Salas departed the UC Location to gather the equipment needed.

54. ATF led a surveillance detail of the suspects utilizing Drug Enforcement Administration (DEA) Special Agents and assets. The surveillance detail observed the suspects drive to the area of 3130 S. Sheridan Blvd., Denver, CO and meet with other individuals in a silver Toyota Camry, bearing Colorado License Plate: DMTQ59. The suspects then departed the area of Sheridan Blvd. Shortly after departing the area, Aguilera-Pericaguan contacted the CI and stated that they had just picked up the materials needed to cook the tusi. The surveillance detail observed the silver Toyota Camry leave the area and park near ▮▮▮ S. Wolf St., Denver, CO. At that point the surveillance detail concluded.

55. On the same date, at approximately 1515 hours, the same five suspects arrived back at the UC Location. Vargas-Morales placed a bag on a counter inside the UC Location. As Guevara-Muro began to set up the table area to begin the manufacturing of the tusi. Guevara-Muro directed Vargas-Morales to take the bag that contained two additional firearms and sell them to the UCs. Vargas-Morales produced two firearms, specifically, a Walther, model PPS, .40 caliber pistol bearing serial number AH2815, with a magazine loaded with seven (7) rounds of .40 caliber ammunition, and a Glock, model 31GEN4, .357 caliber pistol bearing serial number CBYE983, with a magazine. The UCs paid Vargas-Morales $2,700 in in pre-recorded buy money/U.S. currency for the purchase of the firearms and ammunition. The UCs also paid Aguilera-Pericaguan $200 in pre-recorded buy money/U.S. currency as a brokerage fee for his assistance in setting up the firearms transaction. The suspects then advised that they needed a stove in order to manufacture the tusi. Guevara-Muro directed Villalobos-Salas and Vargas-Morales to go purchase a portable stove from a nearby store, and they departed the UC Location to purchase the portable stove. The ATF and DEA surveillance units observed Villalobos-Salas and Vargas-Morales go to the Wal Mart located at: 2770 W. Evans Ave., Denver, Co. Shortly after they returned to the UC Location with the portable stove.

15

56. After Villalobos-Salas and Vargas-Morales returned to the UC Location with the portable stove, Guevara-Muro began the manufacturing process for cooking the tusi. During this time Villalobos-Salas and Vargas-Morales showed the UCs pictures of females that were available for sex trafficking activities on their phones. The suspects reiterated that they would conduct violent crimes for a fee during the time Guevara-Muro was manufacturing the tusi. Villalobos-Salas also advised he had a source of cocaine and that the source could come to the UC Location while they waited for the tusi to finish the cooking process.

57. At approximately 1726 hours, a blue Toyota sedan bearing Colorado license plate ▒▒▒▒▒▒▒ arrived at the UC Location. The vehicle and occupants stayed outside the UC Location but directed Villalobos-Salas to go to the vehicle. Shortly after the meeting with the occupants of the blue Toyota, Villalobos-Salas went back to into the UC Location with cocaine. The UCs purchased ½ ounce (15 grams) of suspected cocaine for $650.00 from Villalobos-Salas.

58. During the controlled purchase, the suspects mentioned that they had associates that were recently on the local news for being involved in jewelry store robberies. They stated that one associate was charged with 20 years in prison, and that he was only supposed to receive $70,000 for his role in the robbery. Guevara-Muro stated that the robbery wasn't worth it and that he would have done it differently. Guevara-Muro explained to the CI and UCs how he would conduct the robbery by doing surveillance of the store prior to conducting a robbery. The suspects also stated that they have associates around the nation that engage in similar criminal activities as the suspects. The suspects advised that they have associates in the Chicago, IL area, the New York City, NY area, and the Miami, FL area. Around the same time, the CI acquired multiple phone numbers from the suspects in order to contact the suspects for future purchases and to connect the suspects with the CI's and UC's associates around the United States. Below are the phone numbers and associates who provided the cell phone numbers to the CI. Guevara-Muro initially told the CI to contact Vargas-Morales if the UCs and CI wanted to contact him.

59. As suspects then wrapped up the cooking process of the tusi, the suspects were then observed adding a variety of powders to the mixture. The suspects explained to the CI and UCs that included in the completed tusi mixture would be methamphetamine, ketamine, LSD, and other powders that would provide an extreme high for anyone who used the tusi narcotic. At this point the manufacturing process of the tusi was completed, and the suspects placed the tusi powder into a clear zip lock baggie and gave it to the UCs. Throughout the entirety of the tusi manufacturing process, Vargas-Morales, Delgado-Perez, Guevara-Muro, and Villalobos-Salas had all assisted in numerous ways to manufacture the tusi. The UCs paid Guevara-Muro $2,700 in in pre-recorded buy money/U.S. currency for the purchase of approximately 51 grams of manufactured tusi. The UCs also paid Aguilera-Pericaguan $300 in pre-recorded buy money/U.S. currency as a brokerage fee for his assistance in setting up the tusi transaction.

60. In total, the UCs purchased 4 firearms, approximately 51 grams of suspected tusi, and approximately 15 grams of suspected cocaine.

16



61. During the conversation with the four suspects, the CI told them that the UC's trafficked the firearms they purchased to the drug cartels in Mexico.

### *Undercover Purchase – March 27, 2025*

62. Leading up to March 27, 2025, at the direction of ATF, the CI engaged in conversation with Aguilera-Pericaguan regarding purchasing firearms from Aguilera-Pericaguan and his criminal associates. Aguilera-Pericaguan was utilizing cellular phone number ▮▮▮▮▮▮▮▮▮▮ during these recorded conversations. The CI coordinated a meeting in Arvada, CO, with the CI, UCs, Aguilera-Pericaguan and a previously unidentified male (who was subsequently identified as Nelo Colmenarez-Morillo).

63. On March 27, 2025, Aguilera-Pericaguan and Colmenarez-Morillo met with ATF UCs to sell a firearm to the UCs. During the meeting, Colmenarez-Morillo produced a Ruger, model Ranch Rifle, .223 caliber rifle, bearing serial number 582-26752. The UCs informed Colmenarez-Morillo that the UCs wanted to purchase the firearm to traffic the firearm down to Mexico. Colmenarez-Morillo, who is a citizen of Venezuela and is in the United States illegally, agreed to sell the firearm to the UCs. The UCs paid Colmenarez-Morillo with pre-recorded buy money/U.S. currency for the firearm. After the purchase of the firearms was completed, Aguilera-Pericaguan was paid an additional amount of pre-recorded buy money/U.S. currency as a brokerage fee for the firearm transaction.

64. During the undercover meeting, Colmenarez-Morillo provided the UCs with the phone number ▮▮▮▮▮▮▮▮▮▮ and informed the UCs they could contact Colmenarez-Morillo to conduct future firearm transactions. Later, on March 27, 2025, Colmenarez-Morillo placed a call utilizing cell phone number ▮▮▮▮▮▮▮▮▮▮ to an ATF UC to discuss additional firearms transactions, as well as future narcotics transactions involving tusi.

65. Also, during the undercover meeting, Aguilera-Pericaguan provided the UCs with the WhatsApp contact "Jose David Gordo" with the phone number ▮▮▮▮▮▮▮▮▮▮. The UCs did not immediately contact this WhatsApp contact. Eventually, that phone number contacted the UCs, and

17

an individual named Jose David Rivas-Mendez conducted additional firearms transactions with the UCs, as well as other illegal activity.



## FIREARMS

66. All of the firearms described above, except those firearms that contain no make, no model, or no serial numbers, were preliminarily examined by an ATF Special Agent who has acquired knowledge and experience relating to firearms and ammunition and specifically the interstate nexus determination of firearms and ammunition through training, investigations, extensive research and review of records, as well as conferring with other experts and contacts within the firearms industry. Based on the preliminary examinations, all the firearms described above, except those firearms that contain no make, no model, or no serial numbers, are firearms as defined in Title 18 U.S.C., Chapter 44, Section 921(a)(3), and that these firearms were not manufactured in the State of Colorado, and therefore traveled in and/or affected interstate and/or foreign commerce prior to being recovered as part of this investigation.

67. The Glock, model 26GEN5, 9mm pistol bearing serial number AFYU582, affixed with a Glock switch machinegun conversion device (allowing the Glock pistol to function as a machinegun), has been examined and confirmed to be a machinegun.

## DRUG TESTING

68. Most of the tusi related above has been tested, and contains ketamine, a schedule III controlled substance. Certain of the samples of tusi also contained MDMA, a schedule I controlled substance, and methamphetamine, a schedule II controlled substance.

## CONCLUSION

69. Based on the aforementioned information, Your Affiant submits that probable cause exists that on or about November 14, 2024, through March 27, 2025, in the State and District of Colorado, the defendant, Luis Aguilera-Pericaguan, committed the subject offenses.

70. As such, Your Affiant respectfully requests that the Court issue a criminal complaint and a corresponding arrest warrant for and against Luis Aguilera-Pericaguan.

71. I, ▮▮▮▮▮▮▮▮, Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the above-mentioned information is true to the best of my information, knowledge and belief.

*/s/* ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
ATF Special Agent

**Affidavit reviewed and submitted by Garreth Winstead, Assistant United States Attorney.**

Sworn to and subscribed before me this ___13th___ day of June 2025.

SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO